RIEMER HESS LLC
Attorneys for Plaintiff
275 Madison Avenue, 26th Floor
New York, New York 10016
(212) 297-0700

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HARRISON CRUIKSHANK, <br><br>       Plaintiff, <br><br>   -against- <br><br> FIRST UNUM LIFE INSURANCE COMPANY & PROVIDENT LIFE AND CASUALTY INSURANCE COMPANY, <br><br>       Defendants. | Index No. 24-6458 <br><br> **COMPLAINT** <br><br> ECF CASE |

    Plaintiff Harrison Cruikshank ("Cruikshank"), by his attorneys Riemer Hess LLC, complaining of unlawful conduct by Defendants First Unum Life Insurance Company ("Unum") and Provident Life and Casualty Insurances Company ("Provident" through its parent companies Unum/Unum Group), alleges:

    1.   This is an action for benefits arising under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, et seq., and to recover prejudgment interest, attorneys' fees, and costs.

    2.   This Court has subject matter jurisdiction pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.  Under Section 502(f) of ERISA, 29 U.S.C. § 1132(f), this Court has jurisdiction without respect to the amount in controversy or the citizenship of the parties.

    3.   Venue is proper pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), in that the breaches took place in this District and Unum resides in or may be found in this District.

**MR. CRUIKSHANK'S PARTICIPATION IN THE LONG TERM DISABILITY PLAN**

1

4.      Mr. Cruikshank is a highly accomplished 34-year-old attorney who last worked as an Associate Attorney of Paul, Weiss, Rifkind, Wharton, and Garrison LLP ("Paul, Weiss").  Paul, Weiss is a multinational law firm that represents many of the world's largest and most important public and private corporations, asset managers and financial institutions, as well as clients in need of pro bono assistance.

5.      Paul, Weiss is headquartered in New York.

6.      Mr. Cruikshank's date of birth is January 29, 1990.

7.      At all relevant times, Mr. Cruikshank has lived in Toronto, Canada.

8.      At all relevant times, Mr. Cruikshank was and is a participant within the meaning of Section 3(7) of ERISA, 29 U.S.C. § 1002(7), in Paul, Weiss' group long term disability insurance plan under Policy Number LTD 44561 001 (the "LTD Plan Document"), which was underwritten by Unum, with a policy effective date of February 1, 2001.

9.      Paul, Weiss provided Mr. Cruikshank with long term disability insurance coverage under the LTD Plan Document.

10.      The LTD Plan Document's governing jurisdiction is New York.

11.      At all relevant times, Unum is and has been the claims administrator of the LTD Plan Document within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. § 1002(16)(A).

12.      At all relevant times, Unum is and has been a fiduciary within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

13.      At all relevant times, the LTD Plan Document is and has been an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. § 1002(1).

14.      Long term disability benefits under the LTD Plan Document are insured by Unum.

15.      Under the LTD Plan Document, Mr. Cruikshank was insured as Eligible Group 3.

16.    The LTD Plan Document defines Group 3 employees as "Associates and those hired in Associate position with the title of Law Clerk, Foreign Lawyers, Visiting Lawyers, Directors/Management Group Employees, Practice Management Attorney, Practice Management Counsel and Technical Advisors in active employment."

17.    The LTD Plan Document states:

All Employees not eligible in another group, You are disabled when Unum determines that:
- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to the same sickness of injury; and
- during the elimination period, you are unable to perform any of the material and substantial duties of your regular occupation.

18.    The LTD Plan Document also states, "After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience."

19.    The LTD Plan Document defines Regular Occupation as "the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location."

20.    The LTD Plan Document defines Gainful Occupation as "an occupation that is or can be expected to provide you with an income at least equal to 60% of your indexed monthly earnings within 12 months of your return to work."

21.    For claimants who are under the age of 60 at the time of disability, the LTD Plan Document defines the Maximum Benefit Period of Payment to be until the age of 65.

22.    Mr. Cruikshank's LTD Plan Document has been eligible for Waiver of Premium since September 1, 2021.

## MR. CRUIKSHANK'S PARTICIPATION IN THE INDIVIDUAL DISABILITY INCOME PLAN

23.     In addition to long term disability benefits under the LTD Plan Document, Paul, Weiss, offers eligible participants of the LTD Plan Document the opportunity to purchase supplemental individual disability coverage over and above the LTD coverage offered under the LTD Plan Document, known as, the Individual Disability Income Plan under Policy Number 36-600-5217170 (the "IDI Plan Document").

24.     At all relevant times, Provident (through its parent company Unum Group) is and has been the claims administrator of the IDI Plan Document within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. § 1002(16)(A). Unless otherwise specified, hereinafter "Provident" and "Unum Group" are both referred to as "Unum."

25.     Paul, Weiss, paid for the IDI Plan Document under a "list bill" arrangement. Unum sent Paul, Weiss, a single bill for each employees' premiums.

26.     The IDI Plan Document's contract state is New York.

27.     The IDI Plan Document claim and appeal is managed from the LTD Plan Document claim, by Unum.

28.     The IDI Plan Document defines "Total Disability" or "Totally Disabled" as that because of Injuries or Sickness:

1.  You are unable to perform the material and substantial duties of Your Occupation; and
2.  You are not engaged in any other occupation; and
3.  You are receiving Physician's Care. We will waive this requirement if we receive written proof acceptable to Us that further Physician's Care would be of no benefit to You.

After the end of the Your Occupation Period, then Total Disability also means:

4.  You are unable to perform the material and substantial duties of Any occupation.

29.     The IDI Plan Document defines Your Occupation as "the occupation or occupations, as performed in the national economy, rather than as performed for a specific employer or in a specific location, in which You are regularly engaged at the time You become Disabled."

30.     The IDI Plan Document defines Any Occupation as "Any Occupation for which You are reasonably fitted based on education, training, or experience."

31.     Mr. Cruikshank's IDI Plan Document has been eligible for Waiver of Premium since February 10, 2021.

## THE *DE NOVO* STANDARD OF REVIEW

Mr. Cruikshank's LTD Claim is Subject to *De Novo* Review

32.     The LTD Plan Document does not contain language granting Unum and Unum Group discretionary authority to determine eligibility for benefits or to interpret the terms therein.

33.     The LTD Plan Document does contain a Certificate that states "When making a benefit determination under the policy, Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy."

34.     The LTD Plan Document's Certificate is not an effective delegation of discretionary authority as the language grants discretion only to Unum and not Unum Group. Due to Unum Group making the determination on both the LTD Plan Document and IDI Plan Document, the delegation is improper.

35.     Unum also provided a purported plan document, titled "Additional Summary Plan Description Information" ("SPD"), dated July 31, 2020.

36.     The SPD includes language purporting to grant Unum and its affiliate Unum Group discretionary authority to make benefit determinations under the Plan.

37.     The discretionary language in the SPD is not an effective delegation of discretionary authority.

38.     The LTD Plan Document does not incorporate the SPD.

39.     Any discretionary language contained in the SPD is not part of the LTD Plan Document.

Mr. Cruikshank's IDI Claim is Subject to *De Novo* Review

40.     The IDI Plan Document does not contain language granting Unum, Unum Group, or Provident discretionary authority to determine eligibility for benefits or to interpret the terms therein.

41.     Attached to the IDI Plan Document is the signed Declaration that grants discretion:

> If coverage applied for qualifies as a benefit under an employee welfare benefit plan established or maintained by the employer and governed by the Employee Retirement Income Security Act of 1974 (ERISA), I acknowledge that my employer delegates the Company, acting through Its agents, discretionary authority to make benefit determinations, resolve factual disputes, and interpret provisions of the plan. I will be entitled to appeal any benefit determination made by the Company that I disagree with pursuant to ERISA.

42.     The Declaration defines the "Company" as Provident Life and Casualty Insurance Company.

43.     Again, Declaration is not an effective delegation of discretionary authority as the language granting discretion is only to Provident or the "Company" and not Unum or Unum Group or its affiliates. Due to Unum Group making the determination on both the LTD Plan Document and IDI Plan Document, the delegation is improper.

44.     For these reasons, both Mr. Cruikshank's IDI claim is subject to a *de novo* review.

**UNUM FAILED TO STRICTLY ADHERE TO ERISA'S CLAIMS REGULATIONS AND FAILED TO PROVIDE MR. CRUIKSHANK WITH A FULL AND FAIR REVIEW**

45.     Even if, *arguendo*, discretionary authority was effective, the Court would nonetheless still review the matter *de novo* because during the claim and administrative review process, Unum failed to comply with the Department of Labor's claims procedure regulations, and its failure to comply was neither inadvertent nor harmless.

46.     Upon information and belief, Unum has not adopted claim procedures in accordance with the Department of Labor regulations.

Unum Violated 29 C.F.R. § 2560.503-1(h)(3)(iii):

47.     29 C.F.R. § 2560.503-1(h)(3)(iii) states: "[I]n deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment ... the appropriately named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment."

48.     Unum failed to strictly adhere to the mandatory requirements of 29 C.F.R. § 2560.503-1(h)(3)(iii) because it rendered a final adverse benefit determination without consulting with a qualified healthcare professional about a key piece of evidence that was submitted in support of the appeal, i.e. the June 19, 2024, rebuttal letter of Mr. Cruikshank's therapist, Erin Hooks MEd, RP.

49.     Ms. Hooks' letter was sent in response to Unum's June 14, 2024 letter containing a peer review report from Dr. Brown. Unum explained that they would grant an extension to respond if Mr. Cruikshank would agree to grant Unum an extension until June 28, 2024 to review Mr. Cruikshank's new evidence and make a final determination. The original due date for Unum to make a decision was June 17, 2024.

50.     Although Unum granted this extension and encouraged Mr. Cruikshank to respond to Dr. Brown's paper review, Unum did not give Ms. Hooks' June 19, 2024, rebuttal letter to peer reviewer Dr. Brown or any qualified healthcare professional. Therefore violating 29 C.F.R. § 2560.503-1(h)(3)(iii).

Unum Violated 29 C.F.R. § 2560.503-1(b)(7)

51.     Unum failed to ensure that all claims and appeals for disability benefits are adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision.  Accordingly, decisions regarding hiring, compensation, termination, promotion, or other

similar matters with respect to any individual (such as a claims adjudicator or medical or vocational expert) must not be made based upon the likelihood that the individual will support the denial of benefit, violating 29 C.F.R. § 2560.503-1(b)(7).

52.    Peter Brown, MD and Malcom Spica, PhD., were Unum's paper reviewers for Mr. Cruikshank's appeal.

53.    Dr. Brown and Dr. Spica are not impartial physicians.

54.    Upon information and belief, Dr. Brown is an in-house medical consultant for Unum.

55.    Upon information and belief, Dr. Spica is an independent contractor hired and/or retained directly by Unum, either directly or through a third-party vendor.

56.    Upon information and belief, Dr. Brown and Dr. Spica have conducted reviews in connection with numerous other individuals insured by Unum.

57.    Multiple Courts have criticized Dr. Brown and Dr. Spica. *See, e.g., Berg v. Unum Life Ins. Co. of Am.*, 2023 WL 2619015, at *10-12 (E.D. Mich. Mar. 23, 2023); *Dwyer v. Unum Life Ins. Co. of Am.*, 548 F. Supp. 3d 468, 491-492 (E.D. Pa. 2021); *Meyer v. Unum Life Ins. Co. of Am.,* 2021 WL 1102443, at *23 (C.D. Cal. Mar. 23, 2021); *Twigg v. ReliaStar Life Ins. Co.*, 2020 WL 5819547, at *5, 12 (W.D. Ky. Sept. 11, 2020); *Luu v. First Unum Life Ins. Co. of Am.,* 2019 WL 6622848, at *11-17 (C.D. Cal. Nov. 14, 2019); *Doe v. Unum Life Ins. Co. of Am.*, 116 F. Supp. 3d 221, 228-30 (S.D.N.Y. 2015); *McDonnell v. First Unum Life Ins. Co.,* 2013 WL 3975941, at *25 (S.D.N.Y. Aug. 5, 2013).

58.    Unum knows, or has reason to know, that its in-house medical consultants and the medical consultants hired and/or retained to complete file reviews serve only the interests of insurance companies and never individual claimants.

59.    Upon information and belief, Unum pays substantial sums of money to its medical consultants, whether in-house or independent contractors, to conduct reviews for Unum's insureds.

60. Since the medical consultants derive substantial income from performing file reviews for Unum insureds, the medical consultants have an incentive to provide file reviews that Unum deems favorable in order to perform future file reviews for Unum, receive compensation, and promotion.

61. Unum has failed to take active steps to reduce potential bias and to promote accuracy of its benefit determinations.

Unum Violated 29 C.F.R. § 2560.503-1(h)(4)

62. Unum failed to provide a full and fair review because Unum failed to strictly adhere to all the requirements of ERISA's claims procedure regulations at 29 C.F.R. § 2560.503-1(h)(4).

63. 29 C.F.R. § 2560.503-1(h)(4) requires,

(i) Provide that before the plan can issue an adverse benefit determination on review on a disability benefit claim, the plan administrator shall provide the claimant, free of charge, with any new or additional evidence considered, relied upon, or generated by the plan, insurer, or other person making the benefit determination (or at the direction of the plan, insurer or such other person) in connection with the claim; such evidence must be provided as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided under paragraph (i) of this section to give the claimant a reasonable opportunity to respond prior to that date; and

(ii) Provide that, before the plan can issue an adverse benefit determination on review on a disability benefit claim based on a new or additional rationale, the plan administrator shall provide the claimant, free of charge, with the rationale; the rationale must be provided as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided under paragraph (i) of this section to give the claimant a reasonable opportunity to respond prior to that date.

64. By failing to provide Mr. Cruikshank with the new rationales for the Final Determination in advance of the Final Determination regarding Ms. Hook's rebuttal letter in response to Dr. Brown, denying him a reasonable opportunity to respond, Unum violated 29 C.F.R. § 2560.503-1(h)(4)(ii).

65. Unum's failure to strictly adhere to the requirements of 29 C.F.R. § 2560.503- 1(h)(4) caused and is likely to cause prejudice or harm to Mr. Cruikshank.

66.     Unum's failure to provide a full and fair review adversely affected the development of the administrative record.

<u>No Exceptions Apply to Justify Unum's Procedural Violations</u>

67.     Where a plan grants the administrator discretion, a plan administrator's determination is deemed to be made without the exercise of discretion if the administrator fails to strictly adhere to all the requirements of the Claims Regulations, subjecting that determination to the Court's *de novo* review. 29 C.F.R. § 2560.503-1(l)(2)(i).

68.     The exception to the rule stated at 29 C.F.R. § 2560.503-1(l)(2)(i) is very limited, and the administrator has the burden of proving all the following:

- that the violation was *de minimis*;
- that the violation did not cause, and is not likely to cause, prejudice or harm to the claimant;
- that the violation was for good cause or due to matters beyond the control of the plan; and
- that the violation occurred in the context of an ongoing, good faith exchange of information between the plan and claimant.

69.     The exception, furthermore, will not apply if the violation is part of a pattern or practice of violations by the plan. See 29 C.F.R. § 2560.503-1(l)(2)(ii).

70.     Here, the *de novo* standard applies because Unum violated the regulations, as detailed above in paragraphs 33 through 45, and Unum cannot satisfy its burden of establishing the exception to the Regulation. See 29 C.F.R. § 2560.503-1(l)(2).

## MR. CRUIKSHANK'S REGULAR OCCUPATION

71.     Mr. Cruikshank's Regular Occupation (hereinafter the "Occupation") was as an Associate Attorney and Foreign Legal Consultant.

72.     He was last employed at Paul, Weiss, Rifkind, Wharton, and Garrison LLP, one of the most prestigious law firms in the world from 2016 until 2021. Paul, Weiss, is known both domestically

and internationally, handles high-profile matters for some of the world's largest and most important public and private corporations, asset managers and financial institutions.

73.    Mr. Cruikshank received his B.Arts Sc. (Honors), summa cum laude, from McMaster University in 2012.

74.    Mr. Cruikshank graduated from the University of Toronto Faculty of Law and earned his JD, with honors, in 2016.

75.    At McMaster University and the University of Toronto Faculty of Law, Mr. Cruikshank received many awards and scholarships for high achievement:

- Jeffrey W. Egner Prize in Labour Law (2016)
- Blakes Scholar Award (2014)
- Barbara Ferrier Scholarship in Arts & Science (2012)
- Charon Burke McCain Memorial Scholarship (2011)
- Edwin Marwin Dalley Memorial Scholarship (2011)

76.    Mr. Cruikshank has been admitted to the New York Bar and the Ontario Bar.

77.    Mr. Cruikshank's Occupation is very demanding and stressful.  The Occupation cannot be performed within a predictable, nine-to-five schedule. His Occupation requires high-level mental and social demands, as detailed below.

78.    Mr. Cruikshank's Occupation required long hours, which were often unpredictable and had extremely tight deadlines. He often worked in excess of 60 hours per week. He was on-call 24/7, with the expectation to drop everything to meet the needs of the firm.

79.    Mr. Cruikshank's occupation required working with very tight deadlines, on matters where any error can have significant consequences.

80.    Mr. Cruikshank worked on high value transactions, usually worth hundreds of millions dollars, sometimes tens of billions of dollars. This required extensive attention to detail.

Vocational Report of Amy Leopold, MS CRC

81. During his Appeal Mr. Cruikshank submitted the independent 3rd party vocational report of Amy Leopold, MS CRC, dated January 25, 2024.

82. Ms. Leopold assessed Mr. Cruikshank's Occupation most closely related to "110.107-010 – Lawyer" in the Dictionary of Occupational Titles:

> Conducts criminal and civil lawsuits, draws up legal documents, advises clients as to legal rights, and practices other phases of law: Gathers evidence in divorce, civil, criminal, and other cases to formulate defense or to initiate legal action. Conducts research, interviews clients, and witnesses and handles other details in preparation for trial. Prepares legal briefs, develops strategy, arguments and testimony in preparation for presentation of case. Files brief with court clerk. Represents client in court, and before quasi-judicial or administrative agencies of government. Interprets laws, rulings, and regulations for individuals and businesses. May confer with colleagues with specialty in area of lawsuit to establish and verify basis for legal proceedings. May act as trustee, guardian, or executor. May draft wills, trusts, transfer of assets, gifts and other documents. May advise corporate clients concerning transactions of business involving internal affairs, stockholders, directors, officers and corporate relations with general public. May supervise and coordinate activities of subordinate legal personnel. May prepare business contracts, pay taxes, settle labor disputes, and administer other legal matters. May teach college courses in law. May specialize in specific phase of law.

**Temperaments:**
- Influencing people in their opinions, attitudes, or judgments about ideas or things.
- Performing a variety of duties, often changing from one task to another of a different nature without loss of efficiency or composure.
- Dealing with people beyond giving and receiving instructions.
- Making generalizations, evaluations, or decisions based on sensory or judgmental criteria.

**Aptitudes:**
- General Learning Ability – Superior
- Verbal – Superior
- Numerical - Superior

**Physical Demands:**
- Strength: Sedentary. Sitting for prolonged periods of time with occasional walking and standing. Exert force to 10 lbs. occasionally, or a negligible amount of force frequently to lift, carry, push, pull, or move objects.

83.    Ms. Leopold assessed Mr. Cruikshank's Occupation most closely related to "Lawyers

– 23-1011.00" in the O*Net System:

> Represent clients in criminal and civil litigation and other legal proceedings, draw up legal documents, or manage or advise clients on legal transactions. May specialize in a single area or may practice broadly in many areas of law.

**Tasks:**
- Analyze the probable outcomes of cases, using knowledge of legal precedents.
- Advise clients concerning business transactions, claim liability, advisability of prosecuting or defending lawsuits, or legal rights and obligations.
- Select jurors, argue motions, meet with judges, and question witnesses during the course of a trial.
- Interpret laws, rulings and regulations for individuals and businesses.
- Present evidence to defend clients or prosecute defendants in criminal or civil litigation.
- Represent clients in court or before government agencies.
- Present and summarize cases to judges and juries.
- Study Constitution, statutes, decisions, regulations, and ordinances of quasi-judicial bodies to determine ramifications for cases.
- Prepare, draft, and review legal documents, such as wills, deeds, patent applications, mortgages, leases, and contracts.
- Negotiate settlements of civil disputes.
- Supervise legal assistants.
- Examine legal data to determine advisability of defending or prosecuting lawsuit.
- Evaluate findings and develop strategies and arguments in preparation for presentation of cases.
- Gather evidence to formulate defense or to initiate legal actions, by such means as interviewing clients and witnesses to ascertain the facts of a case.
- Prepare legal briefs and opinions, and file appeals in state and federal courts of appeal.
- Search for and examine public and other legal records to write opinions or establish ownership.
- Confer with colleagues with specialties in appropriate areas of legal issue to establish and verify bases for legal proceedings.
- Perform administrative and management functions related to the practice of law.
- Work in environmental law, representing public interest groups, waste disposal companies, or construction firms in their dealings with state and federal agencies.
- Probate wills and represent and advise executors and administrators of estates.
- Act as agent, trustee, guardian, or executor for businesses or individuals.
- Help develop federal and state programs, draft and interpret laws and legislation, and establish enforcement procedures.

**Skills:**

- Active Listening — Giving full attention to what other people are saying, taking time to understand the points being made, asking questions as appropriate, and not interrupting at inappropriate times.
- Speaking — Talking to others to convey information effectively.
- Reading Comprehension — Understanding written sentences and paragraphs in work related documents.
- Critical Thinking — Using logic and reasoning to identify the strengths and weaknesses of alternative solutions, conclusions or approaches to problems.
- Complex Problem Solving — Identifying complex problems and reviewing related information to develop and evaluate options and implement solutions.
- Judgment and Decision Making — Considering the relative costs and benefits of potential actions to choose the most appropriate one.
- Negotiation — Bringing others together and trying to reconcile differences.
- Persuasion — Persuading others to change their minds or behavior.
- Writing — Communicating effectively in writing as appropriate for the needs of the audience.
- Active Learning — Understanding the implications of new information for both current and future problem-solving and decision-making.
- Time Management — Managing one's own time and the time of others.
- Social Perceptiveness — Being aware of others' reactions and understanding why they react as they do.
- Monitoring — Monitoring/Assessing performance of yourself, other individuals, or organizations to make improvements or take corrective action.
- Systems Analysis — Determining how a system should work and how changes in conditions, operations, and the environment will affect outcomes.
- Coordination — Adjusting actions in relation to others' actions.
- Instructing — Teaching others how to do something.
- Service Orientation — Actively looking for ways to help people.
- Learning Strategies — Selecting and using training/instructional methods and procedures appropriate for the situation when learning or teaching new things.
- Systems Evaluation — Identifying measures or indicators of system performance and the actions needed to improve or correct performance, relative to the goals of the system.

84.    Ms. Leopold assessed that Mr. Cruikshank specialized in mergers and acquisitions. His work was strictly transactional.

85.    Ms. Leopold further assessed that Mr. Cruikshank's Occupation:

Required a "must-have" set of skills, indispensable in the legal profession, such as extensive reading and writing of lengthy, highly complex materials, as well as the ability to work under high pressure to meet tight, non-negotiable deadlines while still satisfying high standards of quality and excellence; ability to multi-task and switch gears

rapidly; ability to manage multiple, unrelated fast-paced transactions; ability to store a lot of contextual, complex, unrelated information in working memory; complex analytical thinking and problem-solving skills; analyzing complex legal and numerical materials with speed and accuracy; precise legal research, writing and analytical skills; excellent communication skills; ability to work long hours; application of legal and industry knowledge; strong memory; strong intellectual reactivity and ability to think quickly and clearly in real-time and under stress, coupled with ability to formulate clear, concise and accurate answers to complex, technical issues or arguments; sustained high levels of attention and concentration; extreme attention to details; public and peer interaction; adaptation to change and unpredictable workflow; independent planning; directing, controlling or planning activities of others; training others; leading and managing teams and transactions; and influencing people in their opinions, attitudes and judgments.

86.     Ms. Leopold concluded that "attorneys work long and unpredictable hours – regularly exceeding 8 hours per day and 40 hours per week. Short nights and "all-nighters" are not uncommon in the legal profession. Attorneys also regularly work on weekends. They are expected to be constantly available and at the ready on a moment's notice to service often pressing clients' needs."

87.     Ms. Leopold further concluded, "Efficiency and accuracy in performance of this work is critical. Quick responsiveness and high-quality turnaround of work product with little notice is a regular demand. Slowed pace, excessive breaks, and errors are not tolerated by employers in the legal profession. Mr. Cruikshank's work was no exception."

Sworn Statement of Mr. Cruikshank

88.     In Mr. Cruikshank's Sworn Statement, dated February 22, 2024, he described his occupational duties as:

     a.   Researching;

     b.   Conducting due diligence;

     c.   Drafting primary and ancillary documents;

     d.   Reading;

     e.   Critical thinking and analyzing;

     f.   Math;

    g.  Problem solving;

    h.  Planning;

    i.  Supervision and training of at least 4 direct reports on legal research, legal writing, due diligence, and other tasks;

    j.  Attend and participate in daily meetings that could last anywhere from 30 minutes to 3 hours;

    k.  Travel;

    l.  Providing general support for complex mergers and acquisitions, securities and intellectual property transactions; and

    m.  Responding promptly and accurately to client requests and the requests of partners, counsel and more senior associates.

<u>Unum's Vocational Report:</u>

89.    The Occupation cannot be performed within a predictable, nine-to-five schedule.

90.    The material duties of the Occupation include:

    a.  Coordinates agreements with key strategic partners.

    b.  Advises, as a subject matter expert, the Law Department, Compliance, Government Relations, and other business units.

    c.  Advises and provides counsel to senior business clients in connection with sales practice issues and other issues. Negotiates, analyzes, and drafts contracts.

    d.  Reviews applicable statutes and regulations.

    e.  Assists with the preparation of responses to various regulatory inquiries.

    f.  Supervises and manages regulatory examinations conducted by external agencies.

    g.  Prepares and reviews registration statements of business development companies.

    h.  May manage and obtain licenses in various states.

    i.  May collaborate with business partners on healthcare insurance issues and healthcare regulatory issues.

    j.  May prepare and report corporate information to the SEC.

    k.  May collaborate with a team of legal professionals.

91.     The physical demands of the Occupation include:

    a.   <u>Sedentary</u> - Involves primarily sitting with brief periods of time standing and walking, and occasional lifting or exerting force up to 10 lbs. Frequent talking with clients and colleagues during the course of the work day would be required.

92.     The mental/cognitive demands of the Occupation specify it is skilled work requiring:

    a.   High level reasoning and problem solving;

    b.   Dealing with the public

    c.   Influencing people in their opinions, attitudes, and judgments; and

    d.   Independent planning.

93.     Unum's vocational report when compared to the Occupation description in paragraphs 82 through 87, is overly simplistic, lacking detail and accuracy found in the more comprehensive report submitted by Ms. Leopold.

94.     Mr. Cruikshank's description of his occupational duties, in paragraph 88, is consistent with Ms. Leopold's vocational report.

95.     Ms. Leopold's vocational report is more representative of Mr. Cruikshank's occupation and any reasonable occupation he would reasonably be fit for.

### MR. CRUIKSHANK'S BACKGROUND AND MENTAL ILLNESS DIAGNOSIS

<u>Unum Approved Mr. Cruikshank's Disability Claims</u>

96.     At all relevant times, Mr. Cruikshank suffers from serious mental illnesses, including anxiety and depression.

97.     At all relevant times, his severe symptoms include but are not limited to:

    a.   active suicidal ideation;

    b.   lack of motivation;

    c.   intolerance to stress;

    d.   need to take frequent, unscheduled breaks throughout the day;

e.  need to lie down and/or take naps frequently and unpredictably throughout the day; unrefreshing, non- restorative sleep;

f.  inability to function predictably, reliably and consistently, both physically and cognitively;

g.  problems with memory and recall;

h.  impaired attention and concentration;

i.  chronic fatigue;

j.  inability to work under timed conditions;

k.  inability to engage with potential and existing clients in a reliable and professional manner;

l.  impaired reading comprehension and problem solving;

m.  inability to multi-task, adapt to change in demands and workflow, monitor, and switch tasks effectively and efficiently; severe brain fog;

n.  diminished stamina; and

o.  impaired ability to make decisions.

98.     Mr. Cruikshank's symptoms are exacerbated by exposure to stressors of routine social interactions, stress, and high-level mental demands leads to further deterioration of his mental state.

99.     Due to increasing psychiatric symptoms, Mr. Cruikshank ceased working as an Associate Attorney of Paul, Weiss on or about February 10, 2021.

100.    Mr. Cruikshank also filed a claim for Long Term Disability ("LTD") benefits and a claim for Individual Disability Insurance ("IDI") benefits (together, the "Claims"), alleging he became disabled on February 10, 2021.

101.    On September 02, 2021, Unum approved Mr. Cruikshank's claim for LTD and IDI benefits, stating, "We have approved your client's benefits because you are unable to perform the material and substantial duties of your regular occupation as defined in the policy."

102.     Unum began paying Mr. Cruikshank LTD and IDI benefits as of August 9, 2021 (following the LTD and IDI Plan's 180-day unpaid waiting period).

103.     Mr. Cruikshank's LTD Plan Document became eligible for waiver of premium September 1, 2021 and IDI Plan Document became eligible for waiver of premium February 10, 2021. Since his date of disability, on February 10, 2021, Mr. Cruikshank continued to seek appropriate treatment for his conditions and continued to provide updated information as requested by Unum.

104.     Unfortunately, since his date of disability, February 10, 2021, to present, Mr. Cruikshank's condition has not improved, and his psychiatric symptoms have worsened.

Unum Terminated Mr. Cruikshank's LTD and IDI Benefits

105.     Unum terminated Mr. Cruikshank's LTD and IDI benefits as of August 30, 2023 by one letter dated August 30, 2023, respectively.

106.     Unum terminated Mr. Cruikshank's waiver of premium as of August 30, 2023, by the LTD and IDI termination of benefits letter dated August 30, 2023.

107.     Unum's LTD and IDI benefit termination letter states: "Based on the information in your file, it is our opinion that you are not limited from performing the material and substantial duties of your occupation, as you performed them prior to disability. Therefore, you are no longer eligible for benefits under these policies and your claim has been closed."

108.     The LTD and IDI benefits termination letter states: "Your Long Term disability policy has been eligible for Waiver of Premium since September 01, 2021 and that waiver will be terminated on August 30, 2023."

109.     Unum determined the mental/cognitive demands of Mr. Cruikshank's occupation "includes high level reasoning and problem solving; dealing with the public; influencing people in their opinions, attitudes, and judgements; and independent planning."

110.    Unum erroneously terminated Mr. Cruikshank's benefits based on the unreliable, unsupported, and incomplete opinions of Dr. Alex Ursprung and Dr. Stephen Gilman.

111.    Neither Dr. Alex Ursprung nor Dr. Stephen Gilman examined Mr. Cruikshank. They only conducted a review of the paper file.

112.    Unum's reliance on Dr. Alex Ursprung nor Dr. Stephen Gilman non-examining paper review reports was unreasonable.

The Paper Review Report of Dr. Alex Ursprung

113.    Dr. Ursprung's August 9, 2023 paper review of Mr. Cruikshank's file states:

> In my opinion, based on the data I have reviewed, Mr. Mr. Cruikshank would no longer be psychiatrically precluded from returning to his occupation. He is stable on his medication. He has made significant progress in therapy and on his medication. His PHQ-9 and G.AD-7 scores have been declining. He is only seen monthly for therapy and monthly for medication checks by his PCP. He is not in psychiatric care. He also has been discussing return to work with his PCP, had been interviewing for jobs, and wanted to return to his employer but they would not accommodate a request for no client contact. There is no documentation in the records I reviewed suggesting he cannot interact with clients. The nature and frequency of his treatment is inconsistent with an impairing psychiatric disorder.

114.    Unum relied on Dr. Ursprung's report in making its decision to terminate benefits.

115.    Unum's reliance on the non-examining report of Dr. Ursprung was unreasonable.

116.    Dr. Ursprung non-examining report is unreliable because:

    a.    Dr. Ursprung's opinion was infected by conflict and bias;

    b.    Dr. Ursprung's conclusions lack foundation and are conclusory;

    c.    Dr. Ursprung failed to consider Mr. Cruikshank's lack of significant improvement and suicidal ideation;

    d.    Dr. Ursprung "cherry-picked" from Mr. Cruikshank's records, only acknowledging some improvement but ignoring persistent or worsened symptoms;

    e.    Dr. Ursprung failed to consider all relevant information, including Mr. Cruikshank's relevant own occupational demands; and

f.   Dr. Ursprung's conclusions were inconsistent with the weight of the evidence.

The Paper Review Report of Dr. Stephen Gilman

117.   Dr. Gilman's August 25, 2023 paper review of Mr. Cruikshank's file states:

The records presented indicate that the claimant still has ongoing depressive symptoms. However, there's no indication of any active medication changes being made in the recent notes reviewed. There's also no indication that there is any recommendation for an escalation of the level of care by either the therapist or the treating physician. The therapist indicates in the August 23, 2023, letter that there are cognitive impairments; however, there's no documentation in the other clinical notes of any globalize problems of focus, concentration, or memory. There's also no indication that this claim is having any problems with emotional dysregulation.

There is no medical evidence that the claimant has had any adverse side effects from medications resulting in functional impairment during the time in question.

Therefore, I agree with the Medical Consultant (MC) in this case that the current medical information does not support impairing mental illness precluding the claimant from continuously performing the usual mental/cognitive occupational demands as identified by the VRC on a full-time basis for the time frame of interest.

118.   Dr. Gilman did not assess whether Mr. Cruikshank had any work restrictions or limitations.

119.   Unum relied on Dr. Gilman's report.

120.   Unum's reliance on the non-examining report of Dr. Gilman was unreasonable.

121.   Dr. Gilman's non-examining report is unreliable because:

a.   Dr. Gilman's opinion was infected by conflict and bias;

b.   Dr. Gilman's conclusions lack foundation and are conclusory;

c.   Dr. Gilman failed to consider the severity of Mr. Cruikshank's condition, including suicidal ideation and the lack of significant improvement;

d.   Dr. Gilman never examined Mr. Cruikshank in-person;

e.   Dr. Gilman's conclusions were inconsistent with the weight of the evidence.

**MR. CRUIKSHANK FILED AN ADMINISTRATIVE APPEAL**

122.    Mr. Cruikshank filed a timely administrative appeal of Unum's termination of LTD and IDI benefits, and waiver of premiums under the LTD and IDI Plans by letter dated February 26, 2024 (the "Appeal").

123.    On appeal, Mr. Cruikshank submitted additional evidence demonstrating that he satisfies the definition of disability under the Plan since his date of disability of February 10, 2021 through August 30, 2023, when his benefits were wrongfully terminated, and through present. Specifically, due to his symptoms, Mr. Cruikshank's medical evidence demonstrates that he cannot:

a.    Tolerate routine social interactions with others, including coworkers, supervisors, and business contacts, because of his anxiety; depression; worry; panic; fatigue; and emotional stability;

b.    Cannot reliably complete a normal workday/workweek on a sustained and consistent basis; and

c.    Cannot meet the high-level mental and stressful demands of any reasonable occupation because these would worsen his psychiatric state and exacerbate his symptoms, including: anxiety; depression; panic; worry; fatigue; and feeling overwhelmed.

124.    Unum's termination also denied Mr. Cruikshank a full and fair review by failing to identify what specific information was necessary and/or missing to perfect his appeal.

125.    With his appeal, Mr. Cruikshank submitted substantial new evidence further demonstrating that he did not experience significant improvement with ongoing treatment; his conditions continued to render him disabled.  Mr. Cruikshank's new evidence included:

a.    Vocational Assessment of Amy Peiser Leopold, MS, CRC, dated 01/25/2024;

b.    Doctor Narrative from Shaylan Govind, MD, dated 2/20/2024

c.    Treatment Records from St. Michael's Hospital, dated March 2021 through February 2024;

d.    Treatment Records from Magenta Health, dated February 2021 through February 2024;

e.    Treatment Records of Erin Hooks, MEd, RP, dated 2/9/2021 through 12/13/2023;

      f.    Neuropsychological Evaluation, performed by Wilfred van Gorp, Ph.D., ABPP, on 10/17/2023 and 10/18/2023;

      g.    Pharmaceutical Records;

      h.    FDA Printouts;

      i.    Sworn Statement of Mr. Cruikshank, dated 2/22/2024;

      j.    Witness Statement of Maya Bielinski, Mr. Cruikshank's wife, dated 2/5/2024;

      k.    Witness Statement of Ken Cruikshank, Mr. Cruikshank's father, dated 2/2/2024; and

      l.    Witness Statement of Alison McQueen, Mr. Cruikshank's stepmother, dated 2/5/2024.

<u>Unum's Review of Mr. Cruikshank's Appeal</u>

126.    Unum based their decision by the four other non-examining paper reviewers, Shannon O'Kelly, M.Ed., CRC, Meagan M. Yeaton, RN BSN, Peter Brown, M.D., and Malcom Spica, Ph.D., who concluded that after review of the updated medical records they did not support ongoing behavioral health restrictions or limitations.

127.    By letter dated March 21, 2024, Unum provided copies of the above-mentioned reports for Mr. Cruikshank to review and respond to.

128.    By letter dated April 19, 2024, Mr. Cruikshank submitted additional evidence in support of his appeal and in rebuttal to the paper reviewers, Ms. O'Kelly, Dr. Spica, Dr. Brown, and Nurse Yeaton including:

      a.    Independent Medical Examination Report with Minnesota Multiphasic Personality Inventory - Third Edition (MMPI-3) from Bahari Talei, Psy.D., Clinical Psychologist, dated April 1, 2024;

      b.    Rebuttal Narrative Letter from Dr. van Gorp, dated March 24, 2024

129.    By letter dated April 24, 2024, Mr. Cruikshank submitted Narrative Letter from Dr. Shaylan Govind dated April 23, 2024, as additional evidence in support of his appeal and in rebuttal to Unum's March 21, 2024 letter.

130.    By letter dated May 2, 2024, Unum provided copies of addendum responses from the paper reviewers, Dr. Spica and Dr. Brown, for Mr. Cruikshank to review and respond to.

131.    By letter dated May 30, 2024, Mr. Cruikshank submitted additional evidence in support of his appeal and in rebuttal to the paper reviewers, Dr. Spica and Dr. Brown, including:

      a.    Rebuttal Narrative Letter, by Dr. van Gorp, dated May 16, 2024;

      b.    Narrative Letter, by Dr. Kin Cheong Tsui, dated May 28, 2024;

      c.    Rebuttal Narrative Letter from Dr. Talei dated May 15, 2024;

      d.    Office Visit Notes from Magenta Health dated October 16, 2023 to April 23, 2024;

      e.    Office Visit Notes from St. Michael's dated February 6, 2024 to May 22, 2024; and

      f.    Chart of Mr. Cruikshank's severe psychiatric and emotional symptoms.

132.    By letter dated June 6, 2024, Unum provided copies of addendum responses from the paper reviewers, Dr. Spica and Dr. Brown, for Mr. Cruikshank to review and respond to.

133.    By letter dated June 13, 2024, Mr. Cruikshank submitted additional evidence in support of his appeal and in rebuttal to the paper reviewers, Dr. Spica and Dr. Brown, including:

      a.    Narrative Letter, by Dr. Tsui, dated June 13, 2024;

      b.    Office Visit Notes from Erin Hooks, Med, RP dated January 10, 2024 to June 5, 2024.

134.    By letter dated June 14, 2024, Unum provided a copy of addendum response from paper reviewer, Dr. Brown, for Mr. Cruikshank to review and respond to.

135.    By letter dated June 20, 2024, Mr. Cruikshank submitted Narrative Letter from Erin Hooks, Med, RP, dated June 19, 2024, as additional evidence in support of his appeal.

136.    Dr. Brown's non-examining peer review and addendum report are unreliable because:

    a.    Dr. Brown wrongly stated that clinically significant persisting neurocognitive dysfunction due to any etiology was not substantiated by the quantified testing, and the claimant provided performances within normal limits across domains.

    b.    Dr. Brown wrongly concluded that restrictions and limitations due to a psychiatric condition were not supported as of August 31, 2023.

    c.    Dr. Brown failed to consider Mr. Cruikshank's symptoms remain unpredictable, with depressive episodes that would prevent him from working on a reliable and consistent basis;

    d.    Dr. Brown's opinion was infected by conflict and bias;

    e.    Dr. Brown's conclusions lack foundation and are conclusory;

    f.    Dr. Brown never examined Mr. Cruikshank in person;

    g.    Dr. Brown improperly dismissed evidence as not time relevant;

    h.    Dr. Brown failed to consider all relevant information, including how Mr. Cruikshank's symptoms would affect his relevant own occupational demands;

    i.    Dr. Brown failed to consider the severity of Mr. Cruikshank's condition, including suicidal ideation and the lack of significant improvement;

    j.    Dr. Brown improperly ignored the severe emotional results of Mr. Cruikshank's October 2023 neuropsychological evaluation, only commenting on how he did not have a neurocognitive disorder;

    k.    Dr. Brown improperly concluded that Mr. Cruikshank's treatment and polypharmacy regimen were inconsistent with a severe psychiatric condition;

    l.    Dr. Brown failed to consider the side effects Mr. Cruikshank was experiencing from his medications and his maximum dosages; and

    m.    Dr. Brown's conclusions are inconsistent with the weight of evidence.

137.    Dr. Spica's non-examining peer review and addendum report are unreliable because:

    a.    Dr. Spica wrongly stated that clinically significant persisting neurocognitive dysfunction due to any etiology was not substantiated by the quantified testing, and the claimant provided performances within normal limits across domains.

    b.    Dr. Spica wrongly concluded that restrictions and limitations due to a psychiatric condition were not supported as of August 31, 2023.

c. Dr. Spica failed to consider Mr. Cruikshank's symptoms remain unpredictable, with depressive episodes that would prevent him from working on a reliable and consistent basis;

d. Dr. Spica's opinion was infected by conflict and bias;

e. Dr. Spica's conclusions lack foundation and are conclusory;

f. Dr. Spica never examined Mr. Cruikshank in person;

g. Dr. Spica improperly dismissed evidence as not time relevant;

h. Dr. Spica failed to consider all relevant information, including how Mr. Cruikshank's symptoms would affect his relevant own occupational demands;

i. Dr. Spica failed to consider the severity of Mr. Cruikshank's condition, including suicidal ideation and the lack of significant improvement;

j. Dr. Spica improperly ignored the severe emotional results of Mr. Cruikshank's October 2023 neuropsychological evaluation, only commenting on how he did not have a neurocognitive disorder;

k. Dr. Spica improperly concluded that Mr. Cruikshank's treatment and polypharmacy regimen were inconsistent with a severe psychiatric condition;

l. Dr. Spica failed to consider the side effects Mr. Cruikshank was experiencing from his medications; and

m. Dr. Spica's conclusions are inconsistent with the weight of evidence.

<u>Unum Upheld Its Termination on Appeal</u>

138. On June 25, 2024, Unum informed Mr. Cruikshank by letter of its decision to uphold its termination of LTD and IDI benefits and waiver of premiums under the Plan on review (the "Final Determination").

139. Unum unreasonably relied on the unsupported opinions of biased, non-examining physicians. These physicians unreasonably found no support for restrictions and limitations inhibiting Mr. Cruikshank from performing activities consistent with his occupational demands, contrary to the unanimous conclusions of the medical professionals who have examined him.

140.    The Final Determination is contrary to the preponderance of the evidence, unreasonable and contrary to the substantial evidence submitted by all examining medical professionals including: Caileigh Pilmer, MD; Shaylan Govind, MD; Kin Cheong "Michael" Tsui, MD; clinical psychologist Bahareh Talei, Psy.D.; neuropsychologist William van Gorp Ph.D., ABPP; psychotherapist Erin Hooks, Med, RP, and multiple psychiatrists at St. Michael's Hospital: Dr. Jacqueline Vincent (under the supervision of Dr. Chris Willer); Dr. Andrew Lee (under the supervision of Dr. Beverly Guan); Dr. Perry Menzies, and Dr. Sophia Ly (under the supervision of Dr. Arielle Salama).

141.    Mr. Cruikshank exhausted all administrative remedies under the Plan.

### THE MEDICAL EVIDENCE DEMONSTRATES MR. CRUIKSHANK CANNOT MEET THE DEMANDS OF HIS OCCUPATION

142.    The weight of the evidence demonstrates that Mr. Cruikshank cannot meet the demands of his occupation.

143.    All medical professionals who examined Mr. Cruikshank have unanimously concluded that he is disabled from his psychiatric conditions.

144.    The examining medical professionals who unanimously concluded Mr. Cruikshank cannot work include: Ms. Hooks, Dr. Talei, Dr. van Gorp, Dr. Pilmer, Dr. Govind, Dr. Tsui, and multiple doctors at St. Michael's Hospital including but not limited to Dr. Jacqueline Vincent (under the supervision of Dr. Chris Willer), Dr. Andrew Lee (under the supervision of Dr. Beverly Guan), Dr. Perry Menzies, and Dr. Sophia Ly (under the supervision of Dr. Arielle Salama).

145.    Mr. Cruikshank is now treating with psychiatrist Joanne Leung-Yee, MD.

146.    Ms. Leopold, vocational consultant, concluded with his limitations "Mr. Cruikshank cannot reliably commit to working as an attorney or in any occupation for which he is reasonably fitted, taking into consideration education, training and/or experience."

Mr. Cruikshank's Family Medicine Doctor, Dr. Shaylan Govind

147.    Mr. Cruikshank has been a patient of Dr. Govind since April 2023, when Dr. Caliegh Pilmer went on leave.

148.    Dr. Govind diagnosed Mr. Cruikshank with Major Depressive Disorder, Severe and Generalized Anxiety Disorder.

149.    In the June 27, 2023 Attending Physician Statement, Mr. Cruikshank reported low mood, diminished energy/motivation, and passive suicidal ideation. Dr. Govind assessed Mr. Cruikshank's health restrictions as: not able to work full time hours; not currently able to perform work responsibilities involving communicating with persons other than Paul, Weiss; not able to engage in work tasks or urgent requests outside of normal working hours. Dr. Govind concluded that these were ongoing restrictions.

150.    Dr. Govind's February 20, 2024 narrative letter included a review of the full battery neuropsychological evaluation performed by Wilfred van Corp, Ph.D., on October 17-18, 2023. Dr. Govind concluded:

> I agree with the findings and conclusions of the neuropsychological evaluator. A return to any work at this time could lead to Mr. Cruikshank's condition deteriorating, putting him at risk of self-harm.
>
> Given the nature of his job, Mr. Cruikshank remains unable to perform the material duties of his own occupation or any other similar occupation as an attorney. As an Associate Attorney, he is required to function at an exceedingly high level in terms of concentration, memory, and executive functioning.
>
> I agree with Dr. van Gorp's conclusion and the findings of the neuropsychological evaluation, which confirm and are consistent with my evaluations of Mr. Cruikshank. They are also consistent with conclusions regarding his level of disability. Mr. Cruikshank is disabled and unable to perform the duties of any occupation.

151.    In an April 23, 2024 narrative letter, Dr. Govind disagreed with the reports of Malcom D. Spica, Ph.D. and Peter Brown, MD.. Dr. Govind assessed:

> Mr. Cruikshank is still facing challenges due to his depressive episodes, which can be triggered by social interactions and unpredictable environments. He continues to experience severe and debilitating emotional symptoms, including but not

limited to, profound levels of unhappiness, moodiness, tension, low energy, withdrawal, low self-esteem, hopelessness, confusion, trouble concentrating, difficulty making decisions, anxiety, and suicidal ideation.

Mr. Cruikshank's Family Medicine Doctor, Dr. Kin Cheong "Michael" Tsui

152.    Dr. Tsui has been treating Mr. Cruikshank since May 2024.

153.    Dr. Tsui confirmed that he was the physician taking over for Dr. Govind and Dr. Caileigh Pilmer until she returns from leave.

154.    Dr. Tsui treats Mr. Cruikshank for Major Depressive Disorder (severe) and Generalized Anxiety Disorder.

155.    Dr. Tsui continues to see Mr. Cruikshank on a monthly basis.

156.    Dr. Tsui wrote a narrative letter regarding his review of Mr. Cruikshank's medical history and prior notes from Drs. Govind and Pilmer, his 10/17/2023 and 10/18/2023 neuropsychological evaluation with Dr. van Gorp, and 4/1/2024 independent medical examination with MMPI-3 with Dr. Talei. Dr. Tsui disagreed with the termination of benefits on August 30, 2023. He confirmed any improvement has been minimal, never arising to a level of a return to work on a reliable and consistent basis.

157.    Dr. Tsui described Mr. Cruikshank's recurring depressive episodes, which include multiple documented instances of suicidal attempts (at ages 11, 20, 23, and 31), underline a severe and persistent mental health disorder that severely impairs his social, cognitive, and emotional functioning.

158.    Dr. Tsui described Mr. Cruikshank's psychiatric symptoms as acute anxiety, profound levels of unhappiness, moodiness, despair, tension, low energy, withdrawal, lack of motivation, low self-esteem, hopelessness, confusion, trouble concentrating, difficulty making decisions, anxiety, and suicidal ideation.

159.    Dr. Tsui noted Mr. Cruikshank's symptoms were consistent with Mr. Cruikshank's PAI results during his neuropsychological evaluation. Mr. Cruikshank's BDI-II Depression scale was

3.9 standard deviations from the mean, indicating a profound level of depression and his score on the BAI Anxiety scale was 3 standard deviations from the mean, indicating severe and debilitating anxiety. These findings are not consistent with an ability to engage productively in a work environment.

160. Dr. Tsui assessed that Mr. Cruikshank's MMPI-3 scores reflect emotional issues such as suicidal thoughts, despair, absence of positive feelings, feelings of powerlessness and futility, low self-confidence, stress, worry, and anxiety. Interpersonal problems include low self-esteem and social withdrawal.

161. Dr. Tsui concluded Mr. Cruikshank's conditions cause limitations in his ability to handle routine stressful situations, make decisions, maintain attention, engage with coworkers, supervisors and clients in a reliable and professional manner, execute detail orientated work, mistake free, on tight deadlines, multi-task, and handle routine changes during the workday.

162. Dr. Tsui responded to Unum's correspondence dated June 6, 2024 regarding Dr. Brown's review of medical records. Dr. Tsui confirmed that the review did not accurately reflect Mr. Cruikshank's treatment team's or Dr. Tsui's assessment of Mr. Cruikshank and his course of treatment.

163. Dr. Tsui clarified that Mr. Cruikshank only experienced "marginal improvement." There were no adjustments to medications so as to avoid confounding his rTMS response, but his medication remained at high dosages (Sertraline 200 mg/d and Bupropion XL 300 mg/d).

164. Dr. Tsui concluded in his June 6, 2024 narrative:

Mr. Cruikshank's condition has not improved significantly with rTMS to support a return to any work on a reliable and consistent basis. Mr. Cruikshank received 8 weeks of rTMS for his treatment resistant depression with some subjective improvements in his mood and insomnia but limited objective improvements in his mental status exam or on symptom rating scales. His PHQ9 and GAD7 scores indicated severe depression and anxiety during treatment. Mr. Cruikshank's mental status examinations remained largely unchanged, with continued passive suicidal ideation, mild psychomotor slowing, mild slowed speech, not responding to internal stimuli, and poor eye contact. He still needs to be occasionally prompted for activities of daily living including brushing teeth and showering.

165.     Dr. Tsui confirmed Mr. Cruikshank's treatment course was increasing in intensity. Due to the minimal not permanent improvement from rTMS, ECT is recommended as well as IV ketamine treatment. After being placed on the waiting list, Mr. Cruikshank's medication was increased to supratherapeutic (higher than indicated maximum dosage) and maximum dosages (Sertraline 225 mg/d[1] and Bupropion XL 450 mg/d, respectively).

166.     Dr. Tsui concluded that the termination of benefits on August 30, 2023 was incorrect, as any improvement in Mr. Cruikshank's condition has been minimal, never arising to a level of a return to any reasonable work on a reliable and consistent basis. In fact, his treatment and medication regime has increased; including supratherapeutic and maximum dosages of medications and recommendations for ECT treatments and IV ketamine treatment.

Mr. Cruikshank's Treating Psychotherapist, Erin Hooks MEd, RP, HST

167.     Erin Hooks has been Mr. Cruikshank's psychotherapist since February 9th, 2021.

168.     Erin Hooks treats Mr. Cruikshank for severe psychiatric and emotional symptoms caused by depression and anxiety.

169.     Erin Hooks treatment regimen consists of Cognitive Behavioral Therapy (CBT), Dialectical Behavioral Therapy (DBT), Solution-Focused Therapy techniques, Goal Setting, and developing coping strategies and tools.

170.     Erin Hooks continues to see Mr. Cruikshank on a biweekly basis.

171.     On June 19, 2024, Erin Hooks wrote a narrative letter regarding her review of the 10/17/2023 and 10/18/2023 neuropsychological evaluation with Dr. van Gorp, and 4/1/2024 independent medical examination with MMPI-3 with Dr. Talei. Erin Hooks disagreed with the termination of benefits on August 30, 2023. She confirmed Mr. Cruikshank has not made any

---

[1] As of August 26, 2024 Mr. Cruikshank's Sertraline 225 mg/d has been increased to 350 mg/d.

significant improvement that would allow him to return to any reasonable work on a reliable and consistent basis.

172.    Erin Hooks assessed that Dr. Talei's IME report provided further support for Mr. Cruikshank's symptoms of depressed mood, chronic sadness, hopelessness, worry, panic, irritability, fatigue, thoughts of death, social isolation, feelings of worthlessness, loss of interest and motivation.

173.    Erin Hooks noted Mr. Cruikshank's PAI results during his neuropsychological evaluation revealed profound levels of unhappiness, moodiness, tension, low energy, withdrawal, low self-esteem, hopelessness, confusion, concentration problems, decision making difficulties, anxiety, physical health concerns, and suicidal ideation.

174.    During sessions, Erin Hooks observed psychiatric symptoms consistent with an inability to work. Mr. Cruikshank appeared motivated/focused when making a plan to carry out these goals, but when attempting these activities, he gets overwhelmed, becomes so nervous, and has feelings of panic and "losing his mind." These symptoms are consistent with that Mr. Cruikshank would be unable to handle routine stressful situations in a work environment and would need to take frequent breaks throughout the day to regulate his emotions.

175.    Erin Hooks concluded Mr. Cruikshank's condition has not improved since August 30, 2023 and that he remains unable to perform the material duties of his own occupation or any reasonable occupation.

Neuropsychological Evaluation by Dr. Wilfred van Gorp

176.    Mr. Cruikshank underwent a Neuropsychological Evaluation with Dr. van Gorp on October 17, 2023 and October 18, 2023.

177.    Neuropsychological Evaluation testing was valid and "given the severe and extreme elevations in symptoms of depression and anxiety, Mr. Cruikshank is no doubt experiencing cognitive challenges secondary to severe symptoms of depression and mood in his daily life."

178.    Neurological testing revealed Mr. Cruikshank's attention is poor, as he only performed at the 9th percentile on a test of sustained attention (PASAT)

179.    Dr. van Gorp expressed concerns over Mr. Cruikshank's suicidality:

> The Suicide scale on the PAI is profoundly elevated (over 5 standard deviations above the mean), and this is very worrisome and concerning. His suicidality makes it essential that he continue with psychiatric intervention to prevent a further deterioration in his emotional state. It is my opinion that a return to work at this time would most likely cause a further deterioration in his emotional state and pose a further, extreme risk to him.

180.    Mr. Cruikshank's clinical profile was marked by significant elevations on a number of scales, indicating he is a man in considerable emotional distress. Mr. Cruikshank endorsed the following items:

   a.   I've made plans about how to kill myself (very true)

   b.   I have no interest in life (somewhat true)

   c.   I'm considering suicide (very true)

181.    The results of Neuropsychological Evaluation revealed:

   a.   Mr. Cruikshank only performed at the 9th percentile on a test of sustained attention (PASAT), revealing poor attention.

   b.   On testing of emotional functioning, Mr. Cruikshank revealed severe and debilitating symptoms of depression and anxiety on self-report questionnaires with active suicidal ideation.

   c.   Personality Assessment Inventory (PAI) revealed profound levels of unhappiness, moodiness, tension, low energy, withdrawal, low self-esteem, hopelessness, confusion, concentration problems, decision making difficulties, anxiety, physical health concerns, and suicidal ideation.

   d.   Mr. Cruikshank's score on the Depression scale was 3.9 standard deviations from the mean, in the abnormal direction, indicating a profound level of depression and his score on the Anxiety scale was 3 standard deviations from the mean in the abnormal direction, indicating severe and debilitating anxiety.

182.    Dr. van Gorp concluded in Neuropsychological Evaluation that "The severe and debilitating emotional symptoms documented in this evaluation render him currently unable to work at the level of functioning prior to the onset of severe depression and anxiety."

183.    Dr. van Gorp's March 24, 2024 rebuttal letter further explained that the results of the Neuropsychological Evaluation revealed intact brain function but severe mental dysfunction, and diagnoses of severe Major Depressive Disorder and Generalized Anxiety Disorder, both of which he considered to be debilitating. Dr. van Gorp reiterated his concerns regarding the severity of Mr. Cruikshank's suicidality.

184.    Dr. van Gorp assessed in the March 24, 2024 rebuttal letter that he disagreed with Dr. Spica's and Dr. Brown's review of the Neuropsychological Evaluation and Mr. Cruikshank's neurocognitive scores.

185.    Dr. van Gorp further explained that:

His cognitive test scores, intact as they are, do not in any way, nullify his profound and debilitating neurobehavioral (versus neurocognitive) disease. Put another way, smart people can get severely depressed and become disabled by their depression. Their intelligence should not be used against them as a cudgel.

186.    Dr. van Gorp concluded in his March 24, 2024, rebuttal letter that:

There is absolutely no question, in my mind, that Mr. Cruikshank is fully disabled based upon his psychiatric (i.e. neurobehavioral) disease. Mr. Cruikshank is one of the most functionally impaired persons I have examined in some time, and I remain quite worried about him and his potential for self-harm. He is unable to work, and any return to work at this time would exacerbate his symptoms/illness further.

187.    Dr. van Gorp in his May 16, 2024 rebuttal letter responded to Dr. Spica:

Dr. Spica [insists] that a smart person with severe, disabling depression must exhibit impaired neurocognitive impairment in order to meet his requirement to be disabled. This is an absurd requirement. He criticizes me for repeating it, but I believe he is so wrong, that I am saying it yet again without apology. Is he really saying that smart people can't be disabled due to depression unless they appear brain damaged? That is fundamentally ridiculous. After that assertion, he defers all other opinions to the psychiatrists. Dr. Brown, to my reading, engages in no explanation other than to say that his opinion has not changed, but I could not decipher any reasoning behind this.

I find the MMPI-3 results and the IME highly consistent with my findings, the F scale score consistent with a man in severe emotional distress in which all other validity scales were entirely within normal limits, and the findings fully credible. This is a man who is suicidal, in ongoing frequent psychiatric treatment, and for whom objective assessment confirms is in severe distress. To find otherwise, to me, is to simply engage in hocus pocus with the data. I firmly stand by my conclusions and agree with the conclusions of Dr. Talei that Mr. Cruikshank is disabled.

Independent Medical Examination with MMPI-3 by Dr. Talei

188.    Mr. Cruikshank participated in an independent medical examination with MMPI-3 on April 1, 2024.

189.    "The Minnesota Multiphasic Personality Inventory – Third Edition (MMPI-3) is used to screen for personality and psychosocial disorders in adults and adolescents.  It also is frequently administered as part of a neuropsychological test battery to evaluate cognitive functioning.  The MMPI-3 is composed of 335 true/false items.  It can be administered using a printed test booklet and an answer sheet filled in by hand, or by responding to the items on a computer.  When interpreting scores, please note that a T-score of 65 or above is considered to be elevated. . .. Developed with new normative data and based on the most up-to-date police candidate outcome research, this report helps psychologists identify high-risk candidates in an efficient, evidence-based, and legally defensible way." *See* 5/16/2023 IME and MMPI report; *See also* https://www.ncbi.nlm.nih.gov/books/NBK557525/.

190.    Dr. Talei listed her behavioral observations of Mr. Cruikshank during the examination as his eye contact was fleeting, he appeared fatigued, demonstrated extreme flat affect, and spoke in a monotone fashion.

191.    Dr. Talei concluded Mr. Cruikshank's MMPI-3 was valid, producing scorable responses to all the MMPI-3 items and responding relevantly to the items based on their content.

192.    Mr. Cruikshank's April 1, 2024 MMPI-3 scores:

| Minnesota Multiphasic Personality Inventory – Third Edition (MMPI-3): | | |
|---|---|---|
| Scale Name | Raw Score | T-Score |

| | | |
|---|---|---|
| Cannot Say | 0 | N/A |
| Combined Response Inconsistency (CRIN) | 5 | 48 |
| Variable Response Inconsistency (VRIN) | 3 | 48 |
| True Response Inconsistency (TRIN) | 11 | 60F |
| Infrequent Responses (F) | 14 | 85 |
| Uncommon Virtues (L) | 5 | 56 |
| Adjustment Validity (K) | 5 | 47 |
| Emotional/Internalizing Dysfunction (EID) | 37 | 84 |
| Thought Dysfunction (THD) | 0 | 37 |
| Behavioral/Externalizing Dysfunction (BXD) | 2 | 39 |
| Demoralization (RCd) | 14 | 71 |
| Somatic Complaints (RC1) | 4 | 52 |
| Low Positive Emotions (RC2) | 14 | 89 |
| Antisocial Behavior (RC4) | 1 | 40 |
| Ideas of Persecution (RC6) | 0 | 40 |
| Dysfunctional Negative Emotions (RC7) | 14 | 68 |
| Aberrant Experiences (RC8) | 1 | 44 |
| Hypomanic Activation (RC9) | 0 | 32 |

193.    Mr. Cruikshank's MMPI-3 testing results are elevated, with T-scores well above 65 in:

a.    Infrequent Responses (F) – 85;

b.    Emotional/Internalizing Dysfunction (EID) – 84;

c.    Demoralization (RCd) – 71;

d.    Low Positive Emotions (RC2) – 89; and

e.    Dysfunctional Negative Emotions (RC7) – 68.

36

194. Mr. Cruikshank's MMPI-3 testing results revealed he reported cognitive difficulties including memory problems, difficulties with attention and concentration, and possible confusion.

195. Mr. Cruikshank's MMPI-3 testing results revealed emotional dysfunction including:

   a. Risk of self-harm, preoccupation with suicide and death, and at risk for current suicidal ideation and attempt, exacerbated by poor impulse control;

   b. Considerable and pervasive emotional distress, significant lack of positive emotional experiences and a marked lack of interest;

   c. Presents with pessimism, anhedonia, lack of energy, and displays vegetative symptoms of depression; and

   d. Reports of feelings of sadness, unhappiness, dissatisfaction with his current life, despair, helplessness, hopelessness, overwhelmed, self-doubt and futility, insecurity.

   e. Reports excessive worry, including worries about misfortune and finances, as well as preoccupation with disappointments. He indeed likely worries excessively and ruminates.

   f. Reports multiple anxiety-related experiences, including generalized anxiety and reexperiencing and/or panic.

   g. Experiences significant anxiety and anxiety-related problems, PTSD features including intrusive ideation and nightmares, and panic. He likely complains about stress and feels incapable of controlling his anxiety level.

196. Mr. Cruikshank's MMPI-3 testing results revealed interpersonal dysfunction including:

   a. Describes himself as lacking in positive qualities.

   b. Reports not enjoying social events and avoiding social situations, including parties and other events where crowds are likely to gather.

   c. He very likely is socially introverted, has difficulty forming close relationships, and is emotionally restricted.

197. Based on the MMPI-3 results, Dr. Talei diagnosed Mr. Cruikshank with Major Depressive Disorder – recurrent, moderate (DSM-5 296.32) and Generalized Anxiety Disorder (DSM-5 300.02).

198. Dr. Talei explained:

37

Mr. Cruikshank's significant manifestation of symptoms warranted a diagnosis of Major Depressive Disorder – recurrent, moderate (DSM-5 296.32). For instance, he demonstrates depressed mood, chronic sadness, hopelessness, fatigue, thoughts of death, social isolation, and feelings of worthlessness. Moreover, he has loss of interest and motivation. Such symptoms have also interfered with his functioning (e.g., withdraws from social activities).

The patient's symptoms are also consistent with the diagnosis of Generalized Anxiety Disorder (DSM-5 300.02). In particular, he presents with anxiety about various situations and finds it difficult to control the worry. Symptoms of the patient's anxiety also include irritability, problems with attention, feelings of panic, and keyed up or on edge.

199. Dr. Talei further concluded that "[t]he results of the IME in conjunction with observations and data collected from the clinical interview determined that [Mr. Cruikshank] does experience severe affective distress. He is unable to engage in any employment in a consistent manner."

200. Dr. Talei recommended that Mr. Cruikshank continue psychiatric and psychotherapeutic intervention

<u>St. Michael's Hospital Medical Records</u>

201. Dr. Lee assessed on October 20, 2023, Mr. Cruikshank's mental status evaluation revealed, "his mood was "3.5-4/10, below his baseline" and his affect was restricted. He made minimal eye contact throughout the interview and was slouching in his chair." Mr. Cruikshank reported during his appointment, "Since September-August 2023, he reports a significant decrease in his mood. This has also been associated with sleep disturbance, low energy, poor concentration, feelings of guilt and worthlessness, and increasing passive suicidal ideation." Dr. Lee assessed that his symptomology at this time is consistent with previous episodes described in documentation by his previous psychiatrist, Jacqueline Vincent, MD (supervised by Dr. Wilier and Dr. Mansfield).

202. Dr. Lee concluded on October 30, 2023, His mental status evaluations repeatedly revealed low mood, diminished distress tolerance, passive suicidal ideation, diminished energy and motivation. There are fluctuating degrees of suicidal ideation associated with specific plans. On

assessment Mr. Cruikshank reported no marked improvement in his mood since the up-titration of bupropion to 300 mg.

203.    Dr. Menzies concluded on December 12, 2023, "Harrison states his mood has improved a little since maxing out on the dose of Wellbutrin in addition to his sertraline. However, he continues to endorse depressive symptoms. Harrison has passive suicidal ideation a few times per day with no plan or intent." Dr. Menzies further stated Mr. Cruikshank's sleep and concentration are affected. He feels overwhelmed.

204.    Dr. Lee concluded on December 18, 2024, "in light of mild improvements and partial remission, lack of tolerability of antipsychotics, multiple antidepressant trials, and ongoing functional impairment – we explored the option of rTMS." He further concluded "[Mr. Cruikshank's] anxiety was unchanged since the initiation of bupropion." Mr. Cruikshank continues to "experience muscle tension, heart palpitations, blanking out, and irritability."

205.    Dr. Ly concluded on January 9, 2024, Mr. Cruikshank's depression symptoms have worsened, he is on maximum dosages of his medications (sertraline and bupropion) and will be starting rTMS.

206.    Dr. Ly concluded on April 23, 2024, that Mr. Cruikshank finished rTMS course. She reported, Mr. Cruikshank's mood is currently "okay" 3-4 out of 10 compared to 2-3 out of 10 prior to rTMS. He endorses ongoing anhedonia, sleep continues to be interrupted, energy is low, concentration is poor, persistent guilt/hopelessness, and daily passive suicidal ideation. She noted he is on the waitlist for IV ketamine and ECT.

207.    Dr. Ly concluded on May 14, 2024, that Mr. Cruikshank's mental status exam is unchanged from the previous, intermittent eye contact, mild psychomotor slowing, mood was 4 out of 10, and voiced passive suicidal ideation.

208.    Dr. Ly further noted on May 14, 2024, Mr. Cruikshank's "energy remains low, concentration poor with difficulty reading books and magazine articles. He endorses ongoing thoughts of hopelessness regarding his mental health recovery and intermittent passive suicidal ideation on a daily basis with no intent or plan."

Mr. Cruikshank's Conditions Put Him at Risk of Self-Harm and Suicidal Ideation

209.    On the Columbia-Suicide Severity Rating Scale, on January 29, 2024, Dr. Menzies marked that Mr. Cruikshank is at High Risk.

210.    Dr. Talei noted a history of active suicidal ideation, depression, and anxiety. Dr. Talei concluded from her independent medical exam on April 1, 2024, that "He very likely is preoccupied with death and suicide and is at risk for attempting suicide or self-harm."

211.    On May 15, 2024, Dr. Talei explained, "Based on the results and my observations during his clinical interview of the IME with MMPI-3, Mr. Cruikshank is an individual with severe affective distress with active suicidal ideation, these results are inconducive for any work environment."

212.    Dr. van Gorp concluded on October 18, 2023 that "[Mr. Cruikshank's] suicidality makes it essential that he continue with psychiatric intervention to prevent a further deterioration in his emotional state. It is my opinion that a return to work at this time would most likely cause a further deterioration in his emotional state and pose a further, extreme risk to him."

213.    Dr. van Gorp discussed in the March 24, 2024 letter that "[t]here was very concerning suicidality present, to the extent that I expedited my feedback session to Mr. Cruikshank to be sure he was not of imminent risk."

214.    Dr. van Gorp further explained, "Mr. Cruikshank's score on the Suicide scale of the PAI is 107 in his fully valid profile, which is 5.7 standard deviations above the mean. This score is a

flashing red light to everyone that this man is in serious trouble and at great risk for suicide in the near, intermediate, and long term."

215.    Dr. Tsui noted in his May 28, 2024 letter that the "recurring depressive episodes, which include multiple documented instances of suicidal attempts (at ages 11, 20, 23, and 31), underline a severe and persistent mental health disorder that severely impairs his social, cognitive, and emotional functioning."

216.    On June 13, 2024, Dr. Tsui explained, "Although his suicidal ideation is currently passive, he remains at high risk of self-harm. As discussed above his treatment team and myself are developing a treatment plan in hopes of improving symptoms, but his depression is treatment resistant."

217.    On April 23, 2024, Dr. Govind explained, "Mr. Cruikshank has a past medical history significant for suicide attempts at the ages of 11, 20. 23, and 31. He is actively suicidal, consumed with anxiety and depression.

218.    In his June 19, 2024 letter, Erin Hooks explained, "I agree with Dr. van Gorp that Mr. Cruikshank's suicidality makes it essential that he continue with psychiatric intervention to prevent a further deterioration in his emotional state."

## COUNT I (LTD PLAN)

219.    Mr. Cruikshank repeats and re-alleges the allegations set forth in paragraphs 1 through 218 above.

220.    Unum had no legal basis to terminate Mr. Cruikshank's benefits under the LTD Plan on August 30, 2023, by letter dated August 30, 2023.

221.    Under the terms of the LTD Plan, Unum agreed to provide Mr. Cruikshank with certain benefits under such plan, in accordance with the terms and conditions set forth therein.

222.     To date, Unum has failed and refused to provide Mr. Cruikshank with the benefits under the LTD Plan to which he is rightfully entitled, from date of disability, February 10, 2021, through the present.

223.     Mr. Cruikshank has satisfied all conditions precedent under the LTD Plan Document and is thus eligible to receive benefits beyond the termination date of August 30, 2023.

224.     Unum's determination that Mr. Cruikshank is not Disabled within the meaning of the LTD Plan Document is contrary to the terms of the LTD Plan, ERISA, and the DOL Regulations issued thereunder, contrary to the evidence, unreasonable, and arbitrary and capricious.

225.     The unlawful behavior of Unum is evidenced by the following:

    a.  Denying benefit payments to Mr. Cruikshank when Unum knew that he was entitled to said benefits, in bad faith and contrary to the Plan;

    b.  Unreasonably denying and withholding payments from Mr. Cruikshank knowing his claim for benefits was valid;

    c.  Unreasonably failing to pay benefits without having any evidence, substantial or otherwise, supporting its decision to deny benefits;

    d.  Ignoring Mr. Cruikshank's treating providers' assessments of his medical conditions and how they restrict and limit him from performing his Occupation, without any basis for doing so in violation of 29 C.F.R. § 2560.503-1(h)(2)(iv);

    e.  Failing to explain the basis for disagreeing with the healthcare professionals treating Mr. Cruikshank, in violation of 29 C.F.R. § 2560.503-1(g)(1)(a);

    f.  Failing to take into account all comments and documents submitted, in violation of 29 C.F.R. § 2560.503-1(h)(2)(iv);

    g.  Failing to consult with a qualified healthcare professional in violation of 29 C.F.R. § 2560.503-1(h)(3)(iii);

    h.  Relying on non-examining medical consultants to deny a claim supported by the treating providers and independent medical examiners;

    i.  "Cherry-picking" and selectively highlighting certain factors in medical or reviewing reports to cast a favorable light on its position, while ignoring the conclusions of Mr. Cruikshank's treating providers regarding the conditions for which they render treatment;

j. Completely disregarding Mr. Cruikshank's subjective complaints, his own assessment of his medical conditions, and how they restrict and limit him from performing the Occupation, in violation of 29 C.F.R. § 2560.503-1(h)(2)(iv);

k. Engaging in a pattern of procedural irregularities to advance its own corporate interests in terminating benefits, to the detriment of the Plans' participants;

l. Failing to provide a "full and fair review" as Unum was obligated to do pursuant to 29 C.F.R. § 2560.503-1(h)(4);

m. Failing to provide Mr. Cruikshank with an adequate description of any additional material or information necessary to perfect his claim in violation of 29 C.F.R. §2560.503- 1(g)(1)(iii);

n. Failing to maintain and utilize "reasonable claims procedures" as it was obligated to do pursuant to 29 C.F.R. § 2560.503-1(b), in violation of ERISA;

o. Failing to follow its own internal claims administration policies and procedures;

p. Consistently acting in its own corporate interests instead of those of the Plans and their participants; and

q. Unum's unlawful behavior and violations of ERISA's procedural regulations were purposeful and harmful to Mr. Cruikshank.

226. Mr. Cruikshank has been forced to bring the instant action as a direct result of Unum's unlawful benefit denial and violations of the Plans and ERISA.

227. Under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), Mr. Cruikshank is entitled to recover disability benefits under the Plans that have not been paid to date, with interest, and those that will become due in the future.

## COUNT II (IDI PLAN)

228. Mr. Cruikshank repeats and re-alleges the allegation set forth in paragraphs 1 through 227 above.

229. Unum had no legal basis for terminating Mr. Cruikshank's IDI Plan benefits.

230. Under the terms of the IDI Plan Document, Unum through Provident agreed to provide Mr. Cruikshank with certain benefits under such plan, in accordance with the terms and conditions set forth therein.

231.    To date, Unum has failed and refused to provide Mr. Cruikshank with the benefits under the IDI Plan Document, a benefit to which Mr. Cruikshank is rightfully entitled, from February 10, 2021, through the present.

232.    Mr. Cruikshank has satisfied all conditions precedent under the LTD Plan Document and is thus eligible to receive benefits beyond August 30, 2023.

233.    Unum's determination that Mr. Cruikshank is not Disabled within the meaning of the LTD Plan Document is contrary to the terms of the LTD Plan, ERISA, and the DOL Regulations issued thereunder, contrary to the evidence, unreasonable, and arbitrary and capricious.

234.    The unlawful behavior of Unum is evidenced by the following:

    a. Denying benefit payments to Mr. Cruikshank when Unum knew that he was entitled to said benefits, in bad faith and contrary to the Plan;

    b. Unreasonably denying and withholding payments from Mr. Cruikshank knowing his claim for benefits was valid;

    c. Unreasonably failing to pay benefits without having any evidence, substantial or otherwise, supporting its decision to deny benefits;

    d. Ignoring Mr. Cruikshank's treating providers' assessments of his medical conditions and how they restrict and limit him from performing his Occupation, without any basis for doing so in violation of 29 C.F.R. § 2560.503-1(h)(2)(iv);

    e. Failing to explain the basis for disagreeing with the healthcare professionals treating Mr. Cruikshank, in violation of 29 C.F.R. § 2560.503-1(g)(1)(a);

    f. Failing to take into account all comments and documents submitted, in violation of 29 C.F.R. § 2560.503-1(h)(2)(iv);

    g. Failing to consult with a qualified healthcare professional in violation of 29 C.F.R. § 2560.503-1(h)(3)(iii);

    h. Relying on non-examining medical consultants to deny a claim supported by the treating providers and independent medical examiners;

    i. "Cherry-picking" and selectively highlighting certain factors in medical or reviewing reports to cast a favorable light on its position, while ignoring the conclusions of Mr. Cruikshank's treating providers regarding the conditions for which they render treatment;

j.   Completely disregarding Mr. Cruikshank's subjective complaints, his own assessment of his medical conditions, and how they restrict and limit him from performing the Occupation, in violation of 29 C.F.R. § 2560.503-1(h)(2)(iv);

k.   Engaging in a pattern of procedural irregularities to advance its own corporate interests in terminating benefits, to the detriment of the Plans' participants;

l.   Failing to provide a "full and fair review" as Unum was obligated to do pursuant to 29 C.F.R. § 2560.503-1(h)(4);

m.   Failing to provide Mr. Cruikshank with an adequate description of any additional material or information necessary to perfect his claim in violation of 29 C.F.R. §2560.503- 1(g)(1)(iii);

n.   Failing to maintain and utilize "reasonable claims procedures" as it was obligated to do pursuant to 29 C.F.R. § 2560.503-1(b), in violation of ERISA;

o.   Failing to follow its own internal claims administration policies and procedures;

p.   Consistently acting in its own corporate interests instead of those of the Plans and their participants; and

q.   Unum's unlawful behavior and violations of ERISA's procedural regulations were purposeful and harmful to Mr. Cruikshank.

235.   Mr. Cruikshank has been forced to bring the instant action as a direct result of Unum's unlawful benefit denial and violations of the Plans and ERISA.

236.   Under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), Mr. Cruikshank is entitled to recover disability benefits under the IDI Plan Document that have not been paid to date, with interest, and those that will become due in the future.

## COUNT III (ATTORNEY FEES AND COSTS)

237.   Mr. Cruikshank repeats and re-alleges the allegations set forth in paragraphs 1 through 236 above.

238.   By reason of Unum's failure to pay Mr. Cruikshank's long term disability and individual disability income insurance benefits due under the terms of the Plan, Mr. Cruikshank has been forced to retain attorneys to recover such benefits, for which he has and will continue to incur attorney's fees.

239.    Mr. Cruikshank is entitled to recover reasonable attorneys' fees and the costs of this action, pursuant to Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1).

**WHEREFORE**, Mr. Cruikshank demands judgement against Unum as follows:

A.    For the amount of all long term disability benefits due under the terms of the LTD Plan Document and IDI Plan Document that have not been paid, together with interest thereon;

B.    Clarifying and declaring that the LTD Plan Document and IDI Plan Document are obligated to pay Mr. Cruikshank long term disability benefits in the future as required by the Plans;

C.    For the amount of all waivers of premium benefits due under the terms of the LTD Plan Document and IDI Plan Document that have not been paid, together with interest thereon;

D.    Clarifying and declaring that the LTD Plan Document and IDI Plan Document are obligated to waive Mr. Cruikshank's premiums due in the future as required by the Plans;

E.    For the costs of this action and Mr. Cruikshank's attorney's fees, pursuant to Section 502(g) of ERISA, 29 U.S.C. § 1132(g)(1); and

F.    For such other and further relief as may be deemed just and proper by the Court.


Dated: New York, New York
          August 27, 2024


By:    /s/ *Jennifer Hess*
        Jennifer Hess, Esq.
        RIEMER HESS LLC
        *Attorneys for Plaintiff*
        275 Madison Avenue, 26th Floor
        New York, NY 10016
        (212) 297-0700
        jhess@riemerhess.com